**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Diana Zelaya, as next friend of C.M., a minor, and as Administrator of the Estate of Inyerman Jose Munoz, deceased,<br><br>*Plaintiff,*<br><br>V.<br><br>Montgomery County, Texas;<br>Andrew Smith, *in his individual capacity*;<br>and Johnathan Hollen, *in his individual capacity*,<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br>CIVIL ACTION NO._____<br><br><br><br><br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Diana Zelaya, as next friend of C.M., a minor, and as Administrator of the Estate of Inyerman Jose Munoz, deceased, brings this action against Defendants Andrew Smith, in his individual capacity; Johnathan Hollen, in his individual capacity; and Montgomery County, Texas, and alleges as follows:

## I.    PARTIES

1.    Plaintiff Diana Zelaya, as next friend of C.M., a minor, and as Administrator of the Estate of Inyerman Jose Munoz, deceased, is a resident of Miami-Dade County, Florida. She is the duly appointed Administrator of the Estate and authorized to bring claims on its behalf.

2.    Defendant Montgomery County, Texas is a political subdivision of the State of Texas and may be served with process pursuant to Fed. R. Civ. P. 4(j)(2) by serving its County Judge, Mark J. Keough, at the Alan B. Sadler Commissioners Court Building, 501 North Thompson St., Suite 401, Conroe, Texas 77301.

1

3. Defendant Andrew Smith is an individual who, at all relevant times, was a deputy employed by the Montgomery County Sheriff's Office and acting under color of state law. He is sued in his individual capacity and may be served with process by serving him at his last known residence at 364 Forest Ln, Huntsville, Texas 77340, or wherever he may be found.

4. Defendant Johnathan Hollen is an individual who, at all relevant times, was a deputy employed by the Montgomery County Sheriff's Office and acting under the color of state law. He is sued in his individual capacity and may be served with process at his place of employment, or wherever he may be found.

## II.    JURISDICTION AND VENUE

5. This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fourth Amendment of the Unites States Constitution.

6. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this District, and  Defendants reside or perform their official duties in this District.

## III.    FACTUAL BACKGROUND

### A. The Incident

8. On March 16, 2024, at approximately 11:30 p.m., decedent Inyerman Jose Munoz was lawfully socializing with a friend, Steve, at Rose Rooftop & Restaurant in The Woodlands, Texas.

9. At approximately 2:00 a.m., on March 17, when the establishment closed, Mr. Munoz and Steve exited the bar and walked across the parking lot toward Steve's vehicle.

10. Unbeknownst to either man, Montgomery County Sheriff's Deputy Andrew Smith was on foot patrol in the Waterway area and began observing and following their movements.

2

11. Mr. Munoz and Steve continued toward a nearby parking garage where Steve's vehicle was parked.

12. During this time, Deputy Smith transitioned from foot patrol into a loaner patrol vehicle.

13. Deputy Smith then continued following Mr. Munoz and Steve without their knowledge.

14. After leaving the Waterway area, Steve drove Mr. Munoz southbound on Interstate 45.

15. They exited the freeway and proceeded to Ale & Ivy restaurant on Sawdust Road, where Mr. Munoz had parked his own vehicle.

16. Mr. Munoz exited Steve's vehicle and entered his own vehicle.

17. Deputy Smith continued to observe Mr. Munoz from a distance.

18. Mr. Munoz exited the shopping center and traveled southbound on the Interstate 45 feeder road.

19. Deputy Smith then initiated what he later characterized as a traffic stop of Mr. Munoz.

20. At no time before initiating what he later characterized as a traffic stop did Deputy Smith observe Mr. Munoz commit any violent act.

21. At no time before initiating what he later characterized as a traffic stop did Deputy Smith observe Mr. Munoz pose any threat.

22. At no time before initiating what he later characterized as a traffic stop did Deputy Smith observe Mr. Munoz violate any traffic law.

23. At no time before initiating what he later characterized as a traffic stop did Deputy Smith observe Mr. Munoz commit a crime.

24. At no time before initiating what he later characterized as a traffic stop did Deputy Smith observe Mr. Munoz attempt to commit a crime.

25. Deputy Smith's attempted stop occurred nearly forty-five minutes after he first observed Mr. Munoz and Steve outside the bar.

26. The attempted stop occurred more than three miles from the bar where Deputy Smith first observed them.

27. Mr. Munoz received no notice that a traffic stop was being attempted.

28. Deputy Smith only activated his emergency lights.

29. He did not activate his siren.

30. He did not announce himself over a loudspeaker.

31. He did not roll down his window and yell.

32. Deputy Smith gave no audible or visual signal reasonably communicating that a law enforcement officer was exercising authority over Mr. Munoz.

33. Deputy Smith was unfamiliar with the controls of the loaner patrol vehicle.

34. Deputy Smith followed Mr. Munoz's vehicle with emergency lights activated for less than forty seconds before events beyond Mr. Munoz's control forced him to stop.

35. Prior to initiating the attempted stop, Deputy Smith knew through police radio communications that the feeder road ahead was closed due to police and emergency activity.

36. While pursuing Mr. Munoz, Deputy Smith transmitted over the radio that he had a vehicle failing to yield to a traffic stop that was approaching the accident scene.

37. At the time of this transmission, Deputy Smith had been following Mr. Munoz with emergency lights activated for less than forty seconds.

38. At that moment, Deputy Smith had no reasonable basis to believe that Mr. Munoz was aware that a traffic stop was being initiated.

39.    All reasonable officers would have known that there was no reasonable basis for Mr. Munoz to believe he was being stopped.

40.    Although Deputy Smith had time to radio officers ahead at the accident scene, he failed to take reasonable steps to signal to Mr. Munoz that a lawful traffic stop was being initiated.

41.    Mr. Munoz stepped on the brake and came to a stop because the southbound feeder road was completely blocked by other police and emergency vehicles responding to an earlier, unrelated motor vehicle accident.

42.    At that moment, the southbound feeder road was blocked by emergency vehicles, preventing forward travel.

43.    Deputy Smith stopped behind Mr. Munoz's vehicle and exited his patrol car.

44.    Almost simultaneously, Mr. Munoz's vehicle reversed because he could not proceed forward due to the blocked roadway.

45.    Mr. Munoz's vehicle backed into Deputy Smith's patrol vehicle at a very low rate of speed.

46.    The minor impact of Mr. Munoz's vehicle caused the open door of Deputy Smith's patrol vehicle to strike Deputy Smith and briefly knock him to his knees.

47.    Within less than five seconds, Deputy Smith regained his footing and was standing upright near his patrol vehicle no longer in danger of being struck or pinned.

48.    Deputy Smith drew his service weapon.

49.    As Deputy Smith stood upright near his patrol vehicle, he began firing his service weapon toward Mr. Munoz and Mr. Munoz' vehicle.

50.    At the moment Deputy Smith opened fire, Mr. Munoz's vehicle was not advancing toward Deputy Smith or any officer and did not present an imminent threat of serious bodily harm to any officer or bystander.

51. Deputy Smith fired a total of ten (10) rounds towards Mr. Munoz.

52. Under the circumstances, all reasonable officers would have attempted to communicate in some fashion that they were exercising lawful authority over Mr. Munoz before shooting him ten times.

53. Montgomery County Sheriff's Deputy Johnathan Hollen was among the officers responding to the earlier accident blocking the feeder road.

54. After hearing Deputy Smith's radio transmission, Deputy Hollen ran on foot toward the parked vehicles.

55. Deputy Hollen ran approximately one hundred (100) feet down the freeway entrance ramp.

56. As he approached, Deputy Hollen observed Mr. Munoz's vehicle back into Deputy Smith's patrol vehicle.

57. After observing the low-speed collision, Deputy Hollen drew his service weapon and activated his weapon-mounted flashlight.

58. Approximately five seconds later, Deputy Hollen reached the scene.

59. When Deputy Hollen arrived, Deputy Smith had already regained his footing and was actively firing into Mr. Munoz and his vehicle.

60. Rather than attempt de-escalation or assess whether any threat existed, Deputy Hollen yelled "get out of the car" as he began firing his weapon.

61. Deputy Hollen fired a total of five (5) rounds towards Mr. Munoz.

62. Sergeant M. Berry, who was also responding to the prior accident, ran toward the scene behind Deputy Hollen.

63. While Deputies Smith and Hollen were firing, Sgt. Berry took cover behind a nearby firetruck to avoid being struck by gunfire.

6

64.   More than one and one-half minutes after the shooting ended, Sgt. Berry approached the stopped vehicles.

65.   Upon checking Mr. Munoz, Sgt. Berry called out for gloves and stated that Mr. Munoz "was snorting," indicating Mr. Munoz was still alive when Sgt. Berry reached him.

66.   Mr. Munoz was transported by EMS to Memorial Hermann The Woodlands Hospital and was later transferred to Memorial Hermann Texas Medical Center in Houston, Texas, where he was pronounced deceased.

**B.   The County's Policies and Practices Caused Mr. Munoz's Constitutional Injuries**

67.   Deputies Smith and Hollen acted in the course and scope of their employment when they shot Mr. Munoz.

68.   Deputies Smith and Hollen acted in their capacities as sworn law enforcement officers, and thus, under color of state law when they shot Mr. Munoz.

69.   Deputies Smith and Hollen acted pursuant to Montgomery County's policies and procedures when they shot Mr. Munoz.

70.   Deputies Smith and Hollen acted pursuant to Montgomery County's training when they shot Mr. Munoz.

71.   Deputies Smith and Hollen acted pursuant to their understanding of the Montgomery County's training based on how Montgomery County taught and supervised them when they shot Mr. Munoz.

72.   Montgomery County has long maintained, tolerated, and ratified a custom and practice of permitting its deputies to use deadly force against motorists who are seated inside their vehicles without first conducting a meaningful assessment of whether an actual, imminent threat exists.

73.    This custom and practice is evidenced by the conduct of Montgomery County Sheriff's Deputies in this case.

74.    The policy is such a persistent widespread practice for the officials or employees of Montgomery County, which, although not authorized by officially adopted and promulgated policies, is so common and well settled as to constitute a custom that fairly represents municipal policy.

75.    A responding Montgomery County deputy (Hollen) arrived on scene and immediately discharged his firearm.

76.    The deputy did so without issuing any meaningful warnings or allowing the opportunity for compliance.

77.    The deputy did so without attempting de-escalation.

78.    The deputy did so without evaluating whether Mr. Munoz posed any immediate threat to officer safety or the safety of others.

79.    This conduct was not the result of an isolated mistake or split-second misjudgment.

80.    This conduct was the foreseeable consequence of Montgomery County's policies, customs, and training deficiencies regarding use of force during vehicle encounters.

81.    Montgomery County has failed to adopt, implement, and enforce adequate policies requiring deputies to slow down and assess the totality of the circumstances before using deadly force.

82.    Montgomery County has failed to adopt, implement, and enforce adequate policies requiring deputies to utilize cover and distance before using deadly force.

83.    Montgomery County has failed to adopt, implement, and enforce adequate policies requiring deputies to employ de-escalation techniques before using deadly force.

84. Montgomery County's practices effectively authorize deputies to treat the mere presence of a person inside a vehicle as justification for immediate lethal force.

85. Montgomery County was deliberately indifferent to the known and obvious risk that its failure to provide constitutionally adequate training and supervision regarding vehicle-related encounters would result in unjustified shootings.

86. The need for specialized training on approaching occupied vehicles, threat assessment, and de-escalation is well-established in modern policing.

87. Montgomery County failed to ensure that its deputies were properly trained in these critical areas.

88. It was highly predictable that, as a result, deputies would respond to such encounters with premature and excessive force.

89. Montgomery County deputies acted in conformity with Montgomery County's customs and practices during the incident at issue.

90. Montgomery County deputies used deadly force against Mr. Munoz without constitutional justification.

91. Montgomery County's customs, practices, and deliberate indifference were the moving force behind the violation of Mr. Munoz's clearly established constitutional rights.

92. Montgomery County should have known of the violations in normal law enforcement customs if it had properly exercised its responsibilities, as, for example, where the violations such as these were so persistent and widespread that they were the subject of discussion or of a high degree of publicity.

93. In the light of the duties assigned to specific deputies or employees at Montgomery County the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of Montgomery County can reasonably be said to have been deliberately indifferent to the need.

94.     Montgomery County is liable to the Plaintiff Estate under 42 U.S.C. § 1983.

### IV.     LEGAL CLAIMS

#### Count I:
#### Fourth Amendment (Excessive Force) Pursuant to 42 U.S.C. § 1983

95.     Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

96.     The right to be free from excessive force during a seizure is clearly established. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

97.     42 U.S.C. § 1983 authorizes lawsuits against law enforcement officers who violate federal constitutional rights while acting under color of state law.

98.     Claims that a law enforcement officer used excessive force in violation of the Fourth Amendment to the United States Constitution are analyzed under an "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989).

99.     To state a Fourth Amendment claim of excessive force, a plaintiff must establish that (1) they were seized, (2) they suffered an injury (3) the injury resulted directly from a use of force, and (4) the force used was objectively unreasonable. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004); *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005); *Bush v. Strain*, 513 F.3d 492, 500-01 (5th Cir. 2008).

100.    In the Fifth Circuit, the excessive force inquiry is limited in scope to whether the law enforcement officer or other persons were in danger at the moment when the force was used. *See Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014).

101.    Deputies Andrew Smith and Johnathan Hollen, acting under color of state law, violated Mr. Munoz's clearly established rights under the Fourth Amendment to be free from unreasonable seizures and excessive force.

102.    At approximately 2:45 a.m. on March 17, 2024, Deputy Smith attempted to initiate what he later characterized as a traffic stop of Mr. Munoz more than three miles from the bar where he first observed Mr. Munoz and nearly forty-five minutes after first seeing him, without announcing his presence to Mr. Munoz or alerting Mr. Munoz that he was being stopped by law enforcement.

103.    Deputy Smith had not observed Mr. Munoz commit any crime, any traffic violation, any violent act, or any conduct suggesting that Mr. Munoz posed a threat.

104.    Deputy Smith activated only his emergency lights for less than forty (40) seconds and it was in conformity with the emergency lights that were already present at the blocked southbound feeder road towards which Mr. Munoz was travelling.

105.     Deputy Smith did not activate a siren, use a loudspeaker, roll down his window, or otherwise audibly announce any law enforcement authority over Mr. Munoz.

106.    Deputy Smith knew he was operating a loaner patrol vehicle and was unfamiliar with its controls, thereby limiting his ability to signal a lawful stop.

107.    Deputy Smith was aware through police radio traffic that the feeder road ahead was completely blocked by police and emergency vehicles were present responding to an unrelated accident.

108.    Rather than first confirming whether Mr. Munoz was aware of any attempted stop, Deputy Smith radioed ahead that he had a vehicle "failing to yield."

109.    Deputy Smith made this radio call *within 30 seconds* of turning on his overhead emergency lights without the use of sirens.

110. At the time Deputy Smith made this transmission, he had no reasonable basis to believe that Mr. Munoz knew a traffic stop was being attempted.

111. Because the roadway ahead was blocked, Mr. Munoz applied his brakes and came to a stop.

112. Deputy Smith stopped almost immediately behind Mr. Munoz's vehicle and exited his patrol car.

113. Almost simultaneously, Mr. Munoz's vehicle reversed because he could not proceed forward.

114. Mr. Munoz's vehicle made a slight, low-speed contact with Deputy Smith's patrol vehicle.

115. The minor contact caused Deputy Smith's open car door to strike him and briefly knock him to his knees.

116. Within less than five seconds, Deputy Smith regained his footing and was standing upright near his patrol vehicle no longer in danger of being struck, pinned, or injured.

117. At that moment, Mr. Munoz's vehicle was not advancing toward Deputy Smith or any other officer and did not present an imminent threat of serious bodily harm to any officer or bystander.

118. Despite these facts, Deputy Smith drew his service weapon and fired ten shots at Mr. Munoz and his vehicle.

119. Deputy Hollen, who had been running toward the scene after hearing Deputy Smith's radio transmission, observed only a low-speed collision between the vehicles.

120. When Deputy Hollen arrived, Deputy Smith had already regained his footing and was standing upright near his patrol vehicle actively firing at Mr. Munoz.

121. Deputy Hollen did not attempt de-escalation.

122. Deputy Hollen did not assess whether any threat existed.

123. Deputy Hollen did not attempt to disable the vehicle.

124. Deputy Hollen took no action other than discharging his weapon at Mr. Munoz.

125. Deputy Hollen fired five (5) rounds at Mr. Munoz.

126. Deputies Smith and Hollen failed to provide a meaningful warning or opportunity for compliance before using deadly force, despite having time to do so.

127. Neither Deputy Smith nor Deputy Hollen had, prior to opening fire:

   a. attempted to physically seize Mr. Munoz;

   b. conveyed a clear display of authority over him;

   c. informed him that he was being seized; or

   d. observed any reaction by Mr. Munoz indicating his awareness of an attempted traffic stop.

128. Deputies Smith and Hollen intentionally used physical force against Mr. Munoz by firing bullets with the purpose and objective of causing him serious bodily injury or death.

129. The bullets fired by Deputies Smith and Hollen struck Mr. Munoz and caused catastrophic, life-threatening injuries.

130. At the time deadly force was used, Mr. Munoz did not present an immediate threat of seriously bodily harm to officers or others.

131. All reasonable officers would have recognized under the circumstances that Mr. Munoz did not present an immediate threat to anyone.

132. All reasonable officers would have recognized under the circumstances that there were reasonable alternatives to summarily executing Mr. Munoz for a low speed collision without any indication it was deliberate or that Mr. Munoz even knew there was a vehicle parked behind him.

133. Under these circumstances, the use of deadly force was objectively unreasonable.

134. Deputies Smith and Hollen's actions violated clearly established law prohibiting the use of deadly force against a non-threatening, unarmed individual who is sitting in a stopped vehicle and who poses no immediate danger to anyone.

135. The force used was excessive, unlawful, and undertaken with reckless and callous disregard for Mr. Munoz's constitutional rights.

136. At all relevant times, Deputies Smith and Hollen were trained that deadly force may be used only when a person poses an immediate threat of death or serious bodily injury.

137. Deputies Smith and Hollen:

   a. knew that a person seated inside a vehicle is not, by that fact alone, an immediate threat;

   b. knew that time, distance, and cover were available to them at the scene;

   c. nevertheless chose to rapidly approach Mr. Munoz' vehicle rather than establish cover or containment;

   d. did not issue clear verbal commands to Mr. Munoz before discharging their weapons;

   e. did not attempt to communicate with Mr. Munoz prior to using deadly force;

   f. did not attempt to de-escalate the encounter;

   g. did not attempt to slow the encounter or create additional time for assessment;

   h. did not observe Mr. Munoz point a firearm at any deputy prior to shooting;

   i. did not observe Mr. Munoz fire a weapon prior to shooting;

   j. did not observe Mr. Munoz attempt to flee in a manner that posed an imminent threat prior to shooting;

   k. nevertheless chose to discharge their firearms multiple times at Mr. Munoz;

14

l.  knew that discharging their firearms created a substantial likelihood of death, and consciously disregarded that risk;

m.  chose to shoot rather than utilize less-lethal alternatives available to them;

n.  chose to shoot rather than retreat or reposition;

o.  chose to shoot rather than wait for additional information;

p.  acted despite having sufficient opportunity to pause and reassess.

138.    Deputies Smith and Hollen's conduct demonstrated a reckless and conscious indifference to Mr. Munoz's life and safety.

139.    Deputies Smith and Hollen's conduct was objectively unreasonable under the totality of the circumstances.

140.    Deputies Smith and Hollen knew, or should have known, that their actions violated clearly established constitutional principles governing use of force.

141.    Deputies Smith and Hollen nevertheless proceeded with the use of deadly force.

142.    Deputies Smith and Hollen's conscious indifference directly caused Mr. Munoz's injuries and resulting damages.

143.    Mr. Munoz died as a direct and proximate result of Deputies Smith and Hollen's unconstitutional conduct.

144.    As a direct and proximate result of Defendants' actions, the Plaintiff has incurred and will continue to incur attorneys' fees, costs, and litigation expenses recoverable under 42 U.S.C. § 1988.

**Count II:**
**Fourth and Fourteenth Amendments—*Monell* Liability**
**Pursuant to 42 U.S.C. § 1983**

145.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

146.    "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

147.    At all relevant times, Deputies Andrew Smith and Johnathan Hollen were employees and agents of Montgomery County, Texas, acting within the course and scope of their employment.

148.    Deputies Smith and Hollen were acting in their capacities as sworn law enforcement officers and under color of state law.

149.    Deputies Smith and Hollen acted pursuant to Montgomery County's policies, customs, practices, and procedures.

150.    Deputies Smith and Hollen also acted pursuant to their understanding of Montgomery County's policies, customs, practices, and procedures based on how Montgomery County trained, supervised, and disciplined its officers.

151.    Deputies Smith and Hollen further acted pursuant to Montgomery County's training and their understanding of that training as provided, implemented, and reinforced by Montgomery County.

152.    On March 17, 2024, Deputies Smith and Hollen used deadly force against Mr. Munoz even though:

    a.   Mr. Munoz had committed no violent act;

    b.   Mr. Munoz posed no imminent threat to officers or others;

    c.   Mr. Munoz's vehicle was not advancing toward Deputy Smith or any officer at the time shots were fired;

    d.   Neither Deputy made an announcement of authority over Mr. Munoz;

e.  Deputy Smith had regained his footing standing upright near his patrol vehicle and was no longer in danger; and

f.  No meaningful warning was given or opportunity for compliance was provided to Mr. Munoz before deadly force was used against him.

153.  Deputies Smith and Hollen's conduct reflected not an isolated mistake, but the predictable consequence of Montgomery County's failure to adopt, implement, and enforce constitutionally adequate policies, training, and supervision regarding de-escalation, seizure, and the use of deadly force against drivers.

154.  Montgomery County's failures constituted deliberate indifference to the known and obvious risk that its officers would violate the drivers' Fourth Amendment rights.

155.  Montgomery County's policies, customs, and practices directly caused Deputies Smith and Hollen to believe that immediately resorting to deadly force, without confirming the Decedent's awareness of a stop, without attempts to de-escalate, and without warnings, was permissible.

156.  As a direct and proximate result of Montgomery County's unconstitutional policies, customs, practices, lack of proper training, and deliberate indifference, Mr. Munoz was shot multiple times and killed.

157.  Montgomery County's official policy as promulgated by the Deputies was the moving force behind the violation of Mr. Munoz' constitutional right

158.  Montgomery County is therefore liable under 42 U.S.C. § 1983 for the deprivation of Mr. Munoz's constitutional rights.

159.  Plaintiff seeks all damages available under federal law, including compensatory damages, attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988.

## Count III Cause of Action Against Montgomery County

### A.  Negligent Hiring, Training, Supervision, and Entrustment

160.    In addition, Montgomery County, was independently negligent in one or more of the following aspects:

    a.  Hiring someone they knew, or should have known, was incompetent, unfit, reckless or otherwise posed an unreasonable risk of harm to others;

    b.  Entrusting a weapon to someone they knew or should have known was incompetent, unfit, reckless or otherwise posed an unreasonable risk of harm to others;

    c.  Failing to adequately impose and enforce qualifications and safeguards;

    d.  Failing to adequately train their employees in a manner in keeping with standards and expectation in law enforcement;

    e.   Failing to supervise their employees in a manner in keeping with standards and expectation in law enforcement; and/or

    f.  Retaining someone they knew or should have known was incompetent, unfit, reckless, or otherwise posed an unreasonable risk of harm to others.

161.    Montgomery County is liable for the negligent entrustment of a firearm to Deputies Hollen and Smith whom they knew of should have known were inexperienced and incompetent in the use of such firearms. Montgomery County violated their duty to exercise ordinary care in the entrustment and operation of firearms to Deputies Hollen and Smith given their inexperience.

162.    Each of the acts and/or omissions, whether taken singularly or in any combination constitutes negligence, negligence per se, and gross negligence which proximately caused the Plaintiff's suffering.

### V.    REQUEST FOR RELIEF

163.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor as follows:

18

a.  Compensatory Damages: Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, mental anguish, pain and suffering, physical injury, and death;

b.  Punitive damages as permitted by law;

c.  Attorney's Fees and Costs; and

d.  Discretionary Damages and Relief, including other financial or equitable relief that the Court deems reasonable and just.

## VI.     JURY DEMAND

164.    Plaintiff respectfully demands a trial by jury on all claims and issues in this matter that may be tried to a jury.

## VII.    PRAYER

165.    WHEREFORE PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein and that upon a final hearing thereof, Plaintiff be granted judgment against Defendants for her damages, pre-judgment and post-judgment interest, attorney's fees, costs of suit in an amount within the jurisdictional limits of this court and for such other and further relief to which Plaintiff may show herself entitled.

Respectfully submitted,

By:    /s/ *David E. Harris*
David E. Harris
Federal Bar No. 712461
dharris@shhlaw.com
cc: teamharris@shhlaw.com
**SICO HOELSCHER HARRIS LLP**
819 N. Upper Broadway
Corpus Christi, Texas 78401
Telephone: (361) 653-3300
Facsimile: (361) 653-3333

Alba Varela, P.A.
*Pro Hac Vice Pending*
avarela.avlegal@gmail.com
avarela.private@gmail.com
**AV PROFESSIONAL ASSOCIATION**
1600 Ponce de Leon Blvd.
10th Floor
Coral Gables FL 33134
Telephone: (305) 858-4811
Direct Line: (305) 992-5190